SLIP OPINION

Cite as 2015 Ark. 274

# SUPREME COURT OF ARKANSAS

No. CR-14-1132

| | |
|---|---|
| MATTHEW W. NICHOLS | **Opinion Delivered** June 18, 2015 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. CR13-2206] |
| V. | |
| STATE OF ARKANSAS | HONORABLE WENDELL GRIFFEN, JUDGE |
| APPELLEE | AFFIRMED. |

**JOSEPHINE LINKER HART, Associate Justice**

A Pulaski County jury convicted Matthew W. Nichols of capital murder in the death of Jesse McFadden. The State waived the death penalty and Nichols was sentenced as a habitual offender by the court to life without parole to be served in the Arkansas Department of Correction. His sole argument on appeal is that the circuit court abused its discretion by refusing to give his proffered, nonmodel jury instruction concerning the transition from capital murder to first-degree murder if a juror has reasonable doubt of guilt on the greater charge. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2013). We affirm.

At the trial on August 25, 2014, North Little Rock police officer Jeffrey Elenbaas testified that on May 20, 2013, he was dispatched to 219 Waters Street in North Little Rock. He believed he was responding to a residential fire, to assist the firefighters. However, while he was waiting for the fire department, he was waved toward the driveway of the residence by a man whom he would subsequently learn was Nichols. There he found a nude woman

who had been severely burned, "basically lying in a heap in the driveway." According to Elenbaas, "her skin was completely burned off," but she was still alive.

Elenbaas further testified that Nichols approached him asking for permission to sit in the back seat of the patrol car because there had been what Nichols described as a "family disturbance." He allowed Nichols to sit in the car, with the door open. According to Elenbaas, there was nothing "real striking" about Nichols, but he did detect the smell of gasoline. While Elenbaas was attending to the victim, Nichols left the police car and started walking down an adjacent street. Meanwhile, bystanders approached Elenbaas and disclosed Nichols's involvement with the burned woman. He went after Nichols and took him into custody.

Franklin Hinton, a 15-year acquaintance of the victim, testified that Nichols and McFadden lived together at the Waters Street house. On the day of the murder, he had driven Nichols to an auto-salvage yard, returned with him to the residence, and was drinking a beer while watching Nichols install a brake caliper on his truck. According to Hinton, Nichols had been drinking also but was not intoxicated. Nichols tried to talk to him about his relationship with McFadden, telling him that he thought that McFadden was cheating on him. Hinton claimed that he fended off the discussion, telling Nichols that it was not his business.

Eventually, McFadden arrived. Hinton described her demeanor as "happy going." Nichols told him to wait for him while he went into the house to talk to "my lady." An argument ensued between McFadden and Nichols. Nichols took her telephone, and Hinton

tried unsuccessfully to retrieve it for her when Nichols came outside. Nichols went back into the house, and Hinton decided to leave.

As he walked back to his vehicle, he heard McFadden screaming. He returned to the house because he thought Nichols was beating McFadden. He discovered that the screen door was locked. Unable to see what was going on, he looked into the house from a window. According to Hinton, he saw Nichols dumping gasoline onto McFadden, and "all of a sudden, the whole living room lit up." He yelled at Nichols, but got no response. He saw Nichols steadily pouring gasoline onto McFadden. Hinton stated that he could not understand why the burning gasoline was not flashing back into the gas can. When McFadden fell against the window where he was watching, he recoiled in horror and fell off the porch. He ran from the scene and went straight home. Hinton stated that he did not call the police until the next day.

North Little Rock Detective John Alston testified that he photographed the 219 Waters Street home after McFadden had died of her injuries. He showed the jury a diagram, noting that a five-gallon gas can was found just inside the front door. He described the gas can as red, with the top black and charred. He stated that there were also burn marks on the floor near the front door. Detective Alston then showed pictures of the bathroom, where the toilet seat, shower curtain, and areas of the wall were charred.

North Little Rock Detective Joseph Green testified that he encountered Nichols at the Waters Street house, while Nichols was seated in Officer Elenbaas's patrol car. He noted a faint odor of gasoline. Detective Green recalled that Nichols's nostrils appeared to be

blistered and peeling.

Terry Yancy testified that she was Nichols's niece and McFadden's best friend. She stated that a few weeks before the incident, Nichols told her that he would "burn her up in that house" if McFadden "put him out." According to Yancy, she called McFadden and informed her about what Nichols had said. Yancy also recounted a phone call that she received from McFadden on May 20, 2013, the date of the incident, asking her to bring her some locks because she intended to change the locks at her residence. During that call, she heard Nichols's voice in the background. Yancy claimed that Nichols repeated the threat that if McFadden put him out, "he would burn her up in that motherf---ing house." She perceived that the conversation was interrupted by Nichols snatching the phone from McFadden. Yancy stated that she "sped through town about 80 miles an hour, trying to get to the house." When she arrived, she found yellow crime-scene tape, blood on the sidewalk, and burn marks up to the house. She went to the hospital and saw McFadden. She recalled that McFadden's skin was "just burned and melted, and she had spots of hair and just skin." Her whole body was "swollen and just melted together," and she was on "some kind of machine" that kept her alive just "long enough for us to see her or say goodbye."

Angela Yielding, a neighbor who lived two houses away from McFadden's residence, testified that she was asked by another neighbor to call an ambulance because McFadden's house was on fire. She called the fire department. She claimed that she saw Nichols take a gas can out of a vehicle and go into the house. Yielding "hollered at him" that his house was on fire. She then left. When she returned, she claimed that she saw Nichols pouring

gasoline "on top of some figure." She further testified that she heard a noise that sounded like a "squelch or a scream" and saw flames. The figure was just lying on the ground in the fetal position. Yielding stated that she "saw the lady starting to roll off the porch and roll, roll, roll, roll and then until she stopped . . . at the edge of the driveway." At that point, the person was no longer on fire. She observed Nichols walking around "like he had his chest puffed out." Yielding stated that she told police that Nichols was the person they were looking for. She observed Nichols walking away and did not want him to escape.

The State concluded its case with Dr. Adam Craig, an associate medical examiner with the Arkansas State Crime Laboratory. Craig testified he was not board certified in forensic pathology; nonetheless, he was qualified by the circuit court as an expert. Craig also admitted that he did not perform the autopsy on McFadden, but asserted that he did review the report that was authored by Dr. Dye, the pathologist who had performed the autopsy. Craig stated that the cause of death was determined to be "thermal injuries and smoke and soot inhalation." He reported that Dr. Dye estimated that McFadden sustained burns on 90 percent of her body. Through Craig, the State introduced several gruesome postmortem photographs of McFadden.

Nichols testified in his own defense. He claimed that he had consumed half a pint of gin on the day of the incident. He stated that when he saw McFadden come home from what was supposed to have been an appointment in Drug Court, he became upset because she was dressed inappropriately, wearing what McFadden referred to as her "hoochie mama" clothes." An argument ensued, fueled by his accusations of her infidelity and her threats to

call the police to take him to jail for a sentence that was pending against him for driving on a suspended license. He admitted that they fought over her phone and that he snatched the phone away from her. She called to Frank Hinton to help her, and although Hinton walked to the front of the house, he did not assist her. According to Nichols, McFadden told him that he meant nothing to her and that he was just a "trick." She taunted him, claiming that she had been with another man that day.

Nichols stated that he put McFadden's phone on top of the refrigerator and walked out of the house. He saw the gas can in his truck, picked it up, and went back into the house. McFadden saw that he was carrying a gas can, but the first words out of her mouth were, "Where's my goddamn phone at." According to Nichols, he "tripped" McFadden and doused her with gasoline. He then struck his lighter and "the flame went up." He saw Terry Brunch a few feet from his front door. Brunch shouted to McFadden, "roll NaNa roll." Nichols claimed that he did not plan to burn McFadden before he became upset. However, when McFadden was putting out the fire, he poured more gasoline on her. But as she rolled back toward him, the flame "said woof" and flared up. It burned his face and hands and reignited McFadden. He threw the gas can at the front door. McFadden went into the bathroom, and he heard the shower come on. He started choking on the smoke inside the house and went outside. He started walking down the street and saw a police car approaching. He admitted that he told the officer that he needed to get into the car, and he climbed into the back seat. Nichols stated that he saw McFadden come out of the front of the house, cross the front of the yard, and lie down in the driveway.

Nichols stated that he did not intend to kill McFadden. He just wanted to "hurt her real bad." He explained that he poured additional gas on McFadden because initially he "hadn't hurt her in a way to make her unattractive, you know, for sexual purposes." He stated that he did not hesitate to pour more gas on McFadden because he realized he was "still going to go to jail" after the first dousing.

On appeal, Nichols argues that the circuit court abused its discretion by refusing to give his proffered, nonmodel jury instruction concerning when a juror, who has reasonable doubt about a defendant's guilt on capital murder, may transition to the lesser-included offense of first-degree murder. This argument concerns Nichols's request at trial to have the circuit court use his proffered amended version of AMI Crim. 2d 302. AMI Crim. 2d 302 is the transition instruction, which sets forth the conditions whereby a jury may consider lesser-included offenses. Nichols requested that the circuit court use the following instruction:

> If you as an individual have a reasonable doubt of the defendant's guilt on the charge of Capital Murder, you will then consider the charge of Murder in the First Degree.

Instead, the circuit court gave the following standard AMI Crim. 2d 302 instruction:

> If you have a reasonable doubt of the defendant's guilt on the charge of Capital Murder, you will then consider the charge of Murder in the First Degree.

Nichols argues that his proffered version compensates for the ambiguity in the word "you." He contends that "you," in this context, could mean either an individual juror, or the jury as a whole, which could have precluded an individual juror from considering the lesser-included offense of first-degree murder.

Nonmodel jury instructions should be given only when the circuit judge finds that the model instruction does not state the law or does not contain a needed instruction on a subject. *Henderson v. State*, 284 Ark. 493, 684 S.W.2d 231 (1985). When reviewing whether a jury instruction is ambiguous, this court never considers it in artificial isolation; it must be judged in the context of the instructions as a whole. *Estelle v. McGuire*, 502 U.S. 62 (1991). We hold that AMI Crim. 2d 302 is a correct statement of the law and is not ambiguous. We note that with regard to reasonable doubt, the jury was instructed, in pertinent part, as follows: "A juror is satisfied beyond a reasonable doubt if, after an impartial consideration of all the evidence, he or she has an abiding conviction of the truth of the charge." Furthermore, when the jury was polled after the verdict was rendered, each juror individually affirmed that it was his or her verdict. Thus, the circuit court did not abuse its discretion in refusing to give Nichols's proffered modification.

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2013), the record has been reviewed for all objections, motions, and requests that were decided adversely to Nichols and no prejudicial error has been found.

Affirmed.

*Bret Qualls* and *Lott Rolfe IV*, Deputy Public Defenders, by: *Clint Miller*, Deputy Public Defender, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.